No. 25-51034

# In the United States Court of Appeals for the Fifth Circuit

Min Huang; Qiong Dai,

Plaintiffs–Appellants,

v.

Ken Paxton, Attorney General, State of Texas,

Defendant–Appellee.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLEE

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General

Benjamin Wallace Mendelson
Deputy Solicitor General
Ben.Mendelson@oag.texas.gov

*Counsel for Appellee*

# Certificate of Interested Persons

No. 25-51034

---

Min Huang; Qiong Dai,

Plaintiffs–Appellants,

v.

Ken Paxton, Attorney General, State of Texas,

Defendant–Appellee.

---

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Benjamin Wallace Mendelson
Benjamin Wallace Mendelson
*Counsel for Appellee*

## Statement Regarding Oral Argument

Appellee does not believe that oral argument is necessary to resolve this case. Nonetheless, if the Court finds that oral argument will be helpful, Appellee requests to participate.

# Table of Contents

Page

Certificate of Interested Persons .......... i
Statement Regarding Oral Argument .......... ii
Table of Authorities .......... v
Statement of Jurisdiction .......... 1
Issues Presented .......... 2
Introduction .......... 3
Statement of the Case .......... 5
  I. Statutory Background .......... 5
  II. Factual and Procedural Background .......... 7
Summary of the Argument .......... 11
Standard of Review .......... 13
Argument .......... 14
  I. Huang and Dai Lack Standing. .......... 14
    A. Dai has not shown that SB 17 applies to her. .......... 15
    B. Plaintiffs have not shown a credible threat of enforcement. .......... 17
      1. Plaintiffs' injuries depend on the independent decisions of third parties. .......... 18
        a. Plaintiffs' injuries depend on the existence of a willing seller .......... 18
        b. Dai's injury further depends on a discretionary act of the federal government. .......... 22
      2. Plaintiffs' injuries depend on locating property they desire to purchase. .......... 23
      3. Plaintiffs' counterarguments are incorrect. .......... 24
    C. Plaintiffs have not established traceability. .......... 27
  II. Sovereign Immunity Bars This Suit. .......... 30
  III. Plaintiffs Have No Cause of Action. .......... 36
  IV. Plaintiffs Do Not Have the Constitutional Rights They Assert. .......... 40
    A. Plaintiffs have no substantial connection to the United States. .......... 40
    B. Plaintiffs' arguments are incorrect. .......... 43

C. The Supremacy Clause does not permit Plaintiffs to assert their claims ........ 47

Conclusion ........ 50

Certificate of Compliance ........ 51

# Table of Authorities

Page(s)

**Cases:**

*A&R Eng'g & Testing, Inc. v. Scott*,
72 F.4th 685 (5th Cir. 2023) .......... 27, 28, 29, 30

*Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*,
591 U.S. 430 (2020) .......... 40

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 44

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 47, 48, 49

*California v. Texas*,
593 U.S. 659 (2021) .......... 21

*Citizens United v. Federal Election Comm'n*,
558 U.S. 310 (2010) .......... 36

*Clapper. Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) .......... 18, 23, 25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... *passim*

*Deep South Ctr. for Env't Just. v. U.S. EPA*,
138 F.4th 310 (5th Cir. 2025) .......... *passim*

*Dep't of State v. Munoz*,
602 U.S. 899 (2024) .......... 23

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) .......... 44, 45, 46

*Energy Mgmt. Corp. v. City of Shreveport*,
397 F.3d 297 (5th Cir. 2005) .......... 30

*Evans v. Garza*,
161 F.4th 315 (5th Cir. 2025) .......... 13

*Free Speech Coalition, Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) .......... 44, 45, 46

*Freedom From Religion Foundation, Inc. v. Mack*,
4 F.4th 306 (5th Cir. 2021) .......... 37, 39, 44

*Glass v. Paxton*,
900 F.3d 233 (5th Cir. 2018) ........................................................ 20, 21, 22, 23, 24

*Healthy Vision Association v. Abbott*,
138 F.4th 385 (5th Cir. 2025) ................................................................ 33, 34, 35

*Hernandez v. Mesa*,
885 F.3d 811 (5th Cir. 2018) (en banc) ................................................ 4, 37, 38, 39

*Hernandez v. United States*,
785 F.3d 117 (5th Cir. 2015) (en banc) ........................................................ 37, 41

*Ibrahim v. Dep't of Homeland Sec.*,
669 F.3d 983 (9th Cir. 2012) ........................................................................ 41, 42

*Immigr. Reform Coal. of Tex. v. Texas*,
706 F. Supp. 2d 760 (S.D. Tex 2010) ..................................................................... 49

*Koppula v. Jaddou*,
72 F.4th 83 (5th Cir. 2023) ................................................................................... 10

*La Union Del Pueblo Entero v. Abbott*,
151 F.4th 273 (5th Cir. 2025) ........................................................................ 25, 26

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................................. 14

*Mi Familia Vota v. Ogg*,
105 F.4th 313 (5th Cir. 2024) ........................................................ 31, 32, 34, 35, 36

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................................ 30

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) .............................................................................. 46

*Nat'l Press Photographers Ass'n v. McCraw*,
90 F.4th 770 (5th Cir. 2024) ..................................................................... 25, 26, 27

*Ochoa-Salgado v. Garland*,
5 F.4th 615 (5th Cir. 2021) .................................................................................. 45

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*,
403 F.3d 324 (5th Cir. 2005) ................................................................................. 49

*Plyler v. Doe*,
457 U.S. 202 (1982) .............................................................................................. 41

*United States, ex rel. Polansky v. Executive Health Res., Inc.*,
599 U.S. 419 (2023) .......................................................................... 48

*Richardson v. Tex. Sec'y of State*,
978 F.3d 220 (5th Cir. 2020)................................................................ 45

*Rodriguez v. Villarreal*,
314 S.W.3d 636 (Tex. App.—Houston [14th Dist.] 2010, no pet.) .................. 33

*Sardino v. Federal Reserve Bank of New York*,
361 F.2d 106 (2d. Cir 1966) ................................................................ 47

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983).............................................................................. 49

*Smith v. Amedisys Inc.*,
298 F.3d 434 (5th Cir. 2002)................................................................ 32

*Stansell v. Revolutionary Armed Forces of Columbia*,
771 F.3d 713 (11th Cir. 2014) ........................................................ 46-47

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021)..................................................... 7

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................ 44

*Tanzin v. Tanvir*,
592 U.S. 43 (2020).............................................................................. 39

*TitleMax of Tex., Inc. v. City of Dallas*,
142 F.4th 322 (5th Cir. 2025)................................................................ 14

*United States v. Rojas*,
812 F.3d 382 (5th Cir. 2016) ................................................................ 41

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ................................................................40, 41, 42

*USAA Texas Lloyds Co. v. Menchaca*,
545 S.W.3d 479 (Tex. 2018)................................................................. 33

*Vote.Org v. Callanen*,
39 F.4th 297 (5th Cir. 2022) ................................................................ 48

*Wang v. Paxton*,
161 F.4th 357 (5th Cir. 2025)........................................................*passim*

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) .......... 37

*Williams v. Phillips Petroleum Co.*,
23 F.3d 930 (5th Cir. 1994) .......... 32

*Ex parte Young*,
209 U.S. 123 (1908) .......... *passim*

**Statutes and Rules:**

28 U.S.C.
§ 1292(a)(1) .......... 1
§ 1331 .......... 1, 49

42 U.S.C. § 1983 .......... *passim*

Tex. Gov't Code
§ 2001.029(a) .......... 33
§ 2001.029(c) .......... 33
§ 2001.033(a) .......... 33

Tex. Ins. Code § 1451.158(b) .......... 34

Tex. Prop. Code
§ 5.251(3)(A) .......... 6
§ 5.251(3)(B) .......... 6
§ 5.251(4) .......... 6, 15
§ 5.252(1) .......... 7
§ 5.252(3) .......... 7
§ 5.253 .......... 6
§ 5.253(1) .......... 6
§ 5.253(2) .......... 6
§ 5.253(4)(A) .......... 6, 15
§ 5.253(4)(B) .......... 15, 16
§ 5.253(4)(B)(i) .......... 6, 16
§ 5.253(4)(B)(ii) .......... 6
§ 5.253(4)(C)-(E) .......... 7
§ 5.255(a) .......... 7, 35
§ 5.255(b) .......... 35
§ 5.255(c) .......... 22
§ 5.255(c)(1) .......... 7, 35§
5.258 .......... 7

§ 5.259 .......... 7
§ 5.259(a) .......... 35

Fed. R. App. P. 4(a)(1)(A) .......... 1

**Other Authorities:**

51 Tex. Reg.
1937 .......... 7, 30, 33
1938 .......... 33
1939 .......... 33
1940 .......... 30, 33

Act of May 29, 2025, 89th Leg., R.S., ch. 956, 2025 Tex. Sess. Law Serv. ch. 956
§1 .......... 5
§ 1(a)(1)(B) .......... 5
§ 1(a)(1)(C)-(G) .......... 5
§ 1(a)(1)(H) .......... 5
§ 1(a)(2)-(4) .......... 5
§ 1(b) .......... 5
§ 8 .......... 7

Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* 9 (Mar. 2025), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf .......... 6

## Statement of Jurisdiction

Plaintiffs invoked the district court's subject-matter jurisdiction by asserting claims arising under the Constitution. ROA.23-31; 28 U.S.C. § 1331. But the district court lacked jurisdiction to adjudicate those claims for the reasons explained below. This Court has appellate jurisdiction over the district court's order denying Plaintiffs' request for a preliminary injunction. ROA.450; 28 U.S.C. § 1292(a)(1). The district court entered its order denying the preliminary injunction on December 9, 2025, ROA.5, and Plaintiffs timely appealed on December 11, 2025, ROA.452; Fed. R. App. P. 4(a)(1)(A).

## Issues Presented

The issues presented are:

1. Whether Plaintiffs lack standing to bring this suit.
2. Whether sovereign immunity bars this suit.
3. Whether Plaintiffs have a private right of action to bring this suit.
4. Whether Plaintiffs have the constitutional rights they assert.

## Introduction

This case is about the power of the federal courts. Plaintiffs believe that it is about whether they, as foreign citizens residing outside the United States, have constitutional rights. But before the Court can reach that merits issue, it must determine whether it has the power to do so. It does not.

To begin, the two Plaintiffs lack Article III standing to bring this case. They assert that a Texas statute is unconstitutional, but one Plaintiff has failed to demonstrate that the statute applies to her. And both have established only speculative injuries. They wish to purchase commercial real estate in Texas, which they believe the statute forbids, but have not even identified a single property they would like to purchase or the existence of a willing seller. Purchasing commercial real estate does not resemble a trip to a retail store and requires a seller to agree to the buyer's terms. And the same Plaintiff who has not shown that the Texas statute applies to her also needs to renew her visa to enter the United States to go real estate shopping, a decision entirely reserved to the federal government. So, the asserted injuries of both Plaintiffs necessarily depend on the independent judgments of third parties. That is fatal to their standing.

Sovereign immunity also bars this suit. Plaintiffs have never once alleged a single act of compulsion or constraint that the Texas Attorney General has taken to enforce the statute at issue. To rule for Plaintiffs, the Court would have to hold that entering into a voluntary settlement agreement in an unrelated case or promulgating a proposed rule are acts of compulsion and constraint.

Perhaps most concerning of all, Plaintiffs have no private right of action to bring this case, as the district court suggested. They sued the Attorney General in his official capacity and so must rely on the equitable cause of action in *Ex parte Young*. But in order for them to use it, the Court would have to extend that judicially-created cause of action beyond what Congress permitted under § 1983 such that a judicially-created cause of action would apply to foreign citizens residing outside the United States when § 1983 does not. This Court's lengthy saga in *Hernandez v. Mesa* cautions against such a holding.

Finally, even if Plaintiffs could establish standing, overcome sovereign immunity, and extend *Ex parte Young* extraterritorially, they would still have to explain how they could assert constitutional claims as foreign citizens residing outside the United States. To do that, they would have to show a "substantial connection" to the United States, a test that they never discuss. Applying that test, at least one appellate court has held that foreign citizens outside the United States whose only connection to this country is previously arriving as a "business visitor" or "tourist" is insufficient. If it reaches this issue, the Court should join its sister circuit on that question.

## STATEMENT OF THE CASE

### I. Statutory Background

In 2025, the Texas Legislature passed a new statute designed to combat the growing national security threats posed by foreign countries like China, Iran, Russia, and North Korea. That statute, Senate Bill 17, begins by making several factual findings based on the United States Director of National Intelligence's 2025 Annual Threat Assessment. *See* Act of May 29, 2025, 89th Leg., R.S., ch. 956, 2025 Tex. Sess. Law Serv. ch. 956, § 1 (S.B. 17). Relevant here, the Legislature found that China uses "an aggressive whole-of-government approach, combined with state direction of the private sector, to become a global science and technology superpower. It wishes to surpass the United States and achieve further economic, political, and military gain." *Id.* § 1(a)(1)(B). To do so, it uses "illicit means," has "stolen hundreds of gigabytes of intellectual property from companies across the world, including from the United States," is "heavily investing in collecting health and genetic data," "poses health risks to the world," and "will continue to expand its coercive, subversive, and malignant influence activities to weaken the United States." *Id.* § 1(a)(1)(C)-(G). To accomplish these things, China "has increased its capabilities to conduct covert influence operations." *Id.* § 1(a)(1)(H). Senate Bill 17 made additional findings regarding threats posed by Russia, Iran, and North Korea. *Id.* § 1(a)(2)-(4).

Based on these threats, the Legislature found it "necessary to exercise the police power of this state," *id.* § 1(b), and restricted China, Russia, Iran, North Korea, and

certain entities and individuals connected to them in specified ways from acquiring an interest in real property in Texas.

Senate Bill 17 begins by defining the term "designated country." Tex. Prop. Code § 5.251(3)(A)-(B). That term means "a country identified by the United States Director of National Intelligence as a country that poses a risk to the national security of the United States in at least one of the three most recent Annual Threat Assessments of the U.S. Intelligence Community." *Id.* § 5.251(3)(A). Presently, that includes China, which the DNI explains "stands out as the actor most capable of threatening U.S. interests globally."[1]

Once a country is designated, certain entities and individuals associated with it "may not purchase or otherwise acquire an interest in real property" in Texas. *Id.* § 5.253. That includes "a governmental entity of a designated country" and certain companies associated with them. *Id.* § 5.253(1)-(2).

The statute also prohibits certain individuals from purchasing land too. Relevant here, that includes an individual who "is *domiciled* in a designated country," *id.* § 5.253(4)(A) (emphasis added), and citizens of designated countries *domiciled* outside the United States in a third country who are not citizens of that third country, *id.* § 5.253(4)(B)(i)-(ii). The term "domiciled" is defined as "having established a place as an individual's true, fixed, and permanent home and principal residence to which the individual intends to return whenever absent." *Id.* § 5.251(4). SB 17 also

[1] Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* 9 (Mar. 2025), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf.

applies to other categories of individuals, *id.* § 5.253(4)(C)-(E), and contains several categorical exceptions, *id.* § 5.252(1), (3).

In terms of enforcement, SB 17 permits the Attorney General to bring in rem actions against real property if he determines that a violation has occurred. *Id.* § 5.255(c)(1). He may also seek civil penalties against "a company or entity" that violates the statute. *Id.* § 5.259. The statute also creates criminal penalties that district attorneys may enforce. *Id.* § 5.258. The Texas Attorney General, however, has no independent power to prosecute crimes. *State v. Stephens*, 663 S.W.3d 45, 55-56 (Tex. Crim. App. 2021). Finally, SB 17 directs the Attorney General to "establish procedures to examine a purchase or acquisition of an interest in real property and determine whether an investigation of a possible violation . . . is warranted." Tex. Prop. Code § 5.255(a). To date, the Attorney General has promulgated only proposed administrative rules under this provision. 51 Tex. Reg. 1937 (2026) (proposed March 27, 2026) (Off. of the Att'y Gen., Foreign Ownership Enforcement). The statute took effect on September 1, 2025. 2025 Tex. Sess. Law Serv. ch. 956, § 8.

Shortly after SB 17 was enacted, a plaintiff sued the Attorney General and argued that the statute was unconstitutional. *Wang v. Paxton*, 161 F.4th 357, 358 (5th Cir. 2025). This Court, however, held that the plaintiff lacked standing to bring that case. *Id.*

## II. Factual and Procedural Background

This case involves three Plaintiffs, only two of which are relevant to this appeal. The first, Min Huang is a citizen of China who lives in Shanghai. ROA.58. She owns investment property in Houston and occasionally visits the United States for reasons

related to her real estate investments. ROA.58-9. She "plan[s] to purchase additional investment properties in Texas," and planned to "visit with Texas real estate agents" in October 2025 but stated "that is on hold because of SB 17." ROA.59.

The second Plaintiff, Qiong Dai, is a citizen of China who lives in New Zealand on a visa. ROA.62. Her daughter attends middle school in New Zealand, and Dai plans to stay in New Zealand until her daughter graduates from high school. ROA.62. Dai owns rental property in the Houston area, previously held a visa to enter the United States, and plans to obtain a new visa to "continue looking for more investment properties in the United States including Texas." ROA.62-63. She "was planning on purchasing a second property in the Houston area" but believes that she cannot do so because of SB 17. ROA.63.

The third Plaintiff, Jiayin Dong, is not part of this appeal. *See* ROA.452 (not listed in notice of appeal).

Plaintiffs, on behalf of themselves and a putative class, sued Texas Attorney General Ken Paxton and brought constitutional challenges to SB 17. ROA.6, 23-31. They alleged that SB 17 is preempted by "federal regimes governing immigration, foreign affairs, foreign investment, and national security," ROA.23, the Fair Housing Act, ROA.28, and the Equal Credit Opportunity Act, ROA.31, and violates the Fourteenth Amendment's Equal Protection Clause, ROA.26.

Plaintiffs moved for a preliminary injunction, ROA.38, and sought class certification, ROA.77. The Attorney General filed a motion to dismiss and argued, as relevant here, that the Plaintiffs lacked standing, ROA.142, that sovereign immunity

barred their claims, ROA.149, and that the Constitution does not apply to foreign citizens located outside the United States, including Huang and Dai, ROA.151.

The district court held a hearing on all the motions in November 2025. ROA.444-45, 479. A few weeks later, it granted the Attorney General's motion to dismiss as to Huang and Dai, declined to rule on the motion as to Dong until this Court's then-pending decision in *Wang v. Paxton* was issued, and denied the motion for a preliminary injunction. ROA.442, 450. The district court did not rule on the class certification motion. ROA.445.

In its order, the district court held that foreign citizens located outside the United States do not have constitutional rights. ROA.447. The Court explained that "Congress may seek to enact laws that afford foreign citizens abroad statutory rights or causes of action against misconduct by U.S. Government officials, or laws that otherwise regulate the conduct of U.S. officials abroad, but that would require a foreign plaintiff to state such a statutory claim." ROA.447.

Huang and Dai, but not Dong, appealed the denial of the preliminary injunction. ROA.452. By coincidence, that same day in December 2025, this Court decided *Wang v. Paxton*. The next day, the Attorney General notified the district court of the decision and explained why that decision requires the district court to grant the motion to dismiss as to Dong and enter final judgment. ROA.454-56. Five months later, in May 2026, the Attorney General again requested a ruling on the remainder of his motion to dismiss. *See* Defendant's Unopposed Request for a Ruling on the Remainder of His Motion to Dismiss, *Huang v. Paxton*, No. 1:25-cv-01509-ADA (W.D. Tex. May 14, 2026). To date, the district court has not ruled, but should it grant the

remainder of the motion to dismiss, this appeal will be moot. *Koppula v. Jaddou*, 72 F.4th 83, 84 (5th Cir. 2023).

## Summary of the Argument

The Court should affirm the judgment of the district court for four independent reasons.

*First*, Plaintiffs lack standing to bring this suit. Dai has not shown that SB 17 applies to her. Neither Plaintiff has shown a credible threat of enforcement of SB 17 because their injuries necessarily depend on the independent decisions of third parties, including the existence of a seller who agrees to sell them property, and in Dai's case, the federal government's permission to enter the United States. Plaintiffs' injuries also depend on all the contingencies involved in purchasing commercial real estate. But at the very least, Plaintiffs must show that they have located commercial property that they intend to purchase before SB 17 could apply to them. They have not done so. Further, Plaintiffs have not established an injury fairly traceable to the Attorney General because this Court has held that Plaintiffs must show acts of actual or threatened enforcement in order to meet that requirement. Plaintiffs have pointed to no relevant acts.

*Second*, sovereign immunity bars this suit because Plaintiffs have pointed to no acts of compulsion or constraint taken by the Attorney General vis-à-vis SB 17. At most, Plaintiffs point to a settlement agreement in an unrelated case, and they might point to the existence of proposed rules in reply, but neither is an act of compulsion or constraint.

*Third*, Plaintiffs have no cause of action. They sued the Attorney General in his official capacity for constitutional claims, so they may only proceed via the equitable cause of action under *Ex parte Young*. But in order to for them to use it, the Court

would have to extend that cause of action beyond the text of § 1983 such that a judicially-created cause of action would apply to foreign citizens outside the United States when § 1983 does not.

*Fourth*, Plaintiffs cannot assert their constitutional claims because they are foreign citizens residing outside the United States and have no substantial connection to the United States. The substantial connection test does not permit them to assert constitutional rights. Nor does the Supremacy Clause permit Plaintiffs to assert the federal government's rights, as they incorrectly contend.

## Standard of Review

This Court reviews the grant or denial of a preliminary injunction for abuse of discretion "with any underlying legal determinations reviewed de novo and factual findings for clear error." *Evans v. Garza*, 161 F.4th 315, 320 (5th Cir. 2025).

## Argument

To obtain a preliminary injunction, a plaintiff must show: (1) likelihood of success on the merits; (2) irreparable harm; (3) that the harm to the plaintiff outweighs harm to the defendant; and (4) that granting the injunction will serve the public interest. *TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025). The district court focused on the first requirement as to Huang and Dai, ROA.450, and they have not raised the other factors before this Court, Appellant Br.4. For at least four reasons, Huang and Dai's claims will not succeed. First, they lack standing. Second, their claims are barred by sovereign immunity. Third, they have no cause of action. Fourth, the Constitution does not apply to them on these facts.

### I. Huang and Dai Lack Standing.

To establish Article III standing, a plaintiff must prove a concrete and particularized injury, fairly traceable to the challenged action of the defendant, and likely redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* at 561. To establish the injury requirement in a pre-enforcement challenge, a plaintiff must show that she "intends to engage in a course of conduct arguably affected with a constitutional interest," that the "intended conduct is arguably proscribed by the statute," and "that the threat of future enforcement of the statute against the plaintiff is substantial." *Wang*, 161 F.4th at 359.

Huang and Dai lack standing for several reasons. First, Dai has not pleaded facts showing that SB 17 applies to her. Second, neither Appellant has established a credible threat of prosecution, and therefore have only speculative injuries, because their

injuries necessarily depend on the independent decisions of third parties like a willing seller, whom they do not plead even exists, and in the case of Dai, on obtaining a new visa to enter the United States, a decision entirely dependent on the federal government. Third, Appellants have not established an injury fairly traceable to the Attorney General.

### A. Dai has not shown that SB 17 applies to her.

Dai has not shown that SB 17 applies to her because she has not established that she is domiciled in China or New Zealand. Rather, she has established that she is domiciled nowhere. And this Court's holdings in *Wang* show that SB 17's definition of "domicile" permits that result.

Once again, SB 17 prohibits an individual from purchasing real property in Texas if she is "*domiciled* in a designated country," including China, or if she is "a citizen of a designated country who is *domiciled* outside the United States *in a country*," "other than a designated country," that is, a third country, of which she is not a citizen. Tex. Prop. Code § 5.253(4)(A)-(B) (emphases added). The statute defines the term "domiciled" as "having established a place as an individual's true, fixed, and permanent home and principal residence to which the individual intends to return whenever absent." *Id.* § 5.251(4).

Under that definition, Dai is not domiciled in either China or New Zealand. Dai states only that she is a "Chinese citizen" who lives in New Zealand "on a valid visa" because her daughter attends middle school there. ROA.62. She plans to stay in New Zealand "till [her] daughter graduates from high school." ROA.62. Those statements do not establish Dai's domicile anywhere for purposes of SB 17.

*First*, that Dai is a citizen of China says nothing about what she considers to be her true, fixed, and permanent home to which she intends to return whenever absent. In *Wang*, a Chinese citizen who lived in the United States on a student visa argued that SB 17 applied to him because he was allegedly domiciled in China. The Court disagreed. *Wang*, 161 F.4th at 360. Interpreting SB 17's domicile provision, the Court held that "Wang's pleadings lack any sort of affirmative statement whatsoever that he intends to return to China." *Id.* "Without any affirmative intent to make China his fixed, permanent home, Wang has not alleged that he is domiciled there under the plain text of SB 17." *Id.* That was true even though Wang was a "Chinese citizen," *id.* at 359, and it is equally true with Dai.

*Second*, Dai has not shown that she is "*domiciled* outside of the United States *in a country* . . . other than a designated country" of which she is not a citizen. Tex. Prop. Code § 5.253(4)(B), (4)(B)(i). Dai has stated only that she lives in New Zealand on a visa because her daughter attends middle school there and intends to stay only until her daughter graduates from high school. ROA.62. Again, those statements contain no "affirmative intent" to make New Zealand her "fixed, permanent home," *Wang*, 161 F.4th at 360, but rather show that she intends to leave New Zealand at a specific time. Thus, Dai has not alleged that she is domiciled in New Zealand either.

Thus, Dai has pleaded that she has no domicile, a permissible result under *Wan*g's interpretation of SB 17's domicile definition. As discussed above, *Wang* held that Wang was not domiciled in China. *Id.* Wang responded that he could not be domiciled in the United States either because he lived here on a student visa, and

"his visa require[d] him to leave the United States when it expires, so he can't be domiciled here." *Id.* The Court, however, held "that may be true, but it is irrelevant. SB 17 only applies to Wang if he is *domiciled in China*. That Wang's visa requires him to leave the United States upon expiration says nothing about his intentions to return to China." *Id.* Thus, the Court acknowledged that Wang may not have been domiciled in the United States, but it did not follow that he must be domiciled in China at the time he lived in the United States on a visa.

The same is true of Dai. As pleaded, she is not domiciled in China, and she is not domiciled in New Zealand where she lives temporarily on a visa. But it does not follow that she must be domiciled somewhere. Thus, Dai's pleadings show that she is domiciled nowhere for purposes of SB 17. That means she has not pleaded that SB 17 applies to her, so she lacks standing to challenge it.[2]

### B. Plaintiffs have not shown a credible threat of enforcement.

Both Plaintiffs have not shown a credible threat of enforcement for three reasons. First, their injuries are speculative because they depend on the independent decisions of third parties, including a willing seller, whom they do not allege exists. And in Dai's case, her purchase is contingent upon obtaining a new visa to enter the United States, a decision committed to the federal government's discretion. Second,

[2] Plaintiffs' complaint is internally inconsistent as to where both Plaintiffs live. It states that Dai lives in New Zealand, ROA.15, and that Huang lives in Shanghai, ROA.14. But the complaint also states that the Plaintiffs are "three individual Chinese citizens who reside in Texas," ROA.6, and later describes the "named plaintiffs" as "people living in Texas," ROA.13-14. If those facts are true, then it is unclear whether SB 17 applies to either Plaintiff at all.

regardless of the existence of willing seller, Plaintiffs' injuries are speculative because they must first at least locate property they wish to purchase before any injury could occur.

### 1. Plaintiffs' injuries depend on the independent decisions of third parties.

#### a. Plaintiffs' injuries depend on the existence of a willing seller.

An Article III injury must be "actual or imminent" and not "speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* "Allegations of *possible* future injury are not sufficient." *Id.*

In the pre-enforcement context, this Court has held that the third prong of the pre-enforcement injury test—whether there is a "credible threat" of prosecution—cannot be met when prosecution depends on a "'highly attenuated chain of possibilities'" within the meaning of *Clapper*. *Tex. State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022) (quoting *Clapper*, 568 U.S. at 410). Relevant here, there is "no credible risk of enforcement where the circumstances leading to prosecution [are] speculative and depend[] in large part on the action of third-part[ies]." *Id.*

In *Clapper*, the plaintiffs challenged section 702 of the Foreign Intelligence Surveillance Act, "which permits federal officials to surveil certain foreigners." *Deep South Ctr. for Env't Just. v. U.S. EPA*, 138 F.4th 310, 321 (5th Cir. 2025) (discussing *Clapper*, 568 U.S. at 401). The Plaintiffs corresponded with people alleged to be

likely targets of FISA surveillance and claimed injury because they believed their communications would be surveilled under FISA. *Id.* The Supreme Court rejected that theory of standing as a "'highly attenuated chain of possibilities.'" *Id.* (quoting *Clappe*r, 568 U.S. at 410.). That was because their injury depended on a series of contingencies, including whether "the FISA court would approve the proposed surveillance." *Id.* Discussing that point, the Supreme Court explained that the Plaintiffs "can only speculate as to whether [the FISA] court will authorize such surveillance." *Clapper*, 568 U.S. at 413. And the court "decline[d] to abandon" its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414.

Similarly, in *Deep South*, this Court followed *Clapper* and rejected another theory of Article III injury based in necessary part on the judgments of independent actors. In that case, the EPA promulgated a rule that granted Louisiana primary enforcement authority over a certain class of carbon sequestration wells. 138 F.4th at 313. A group of environmental organizations sought review of that rule, but the Court held that they lacked standing. *Id.* Their theory of standing was premised on increased energy costs to consumers and included the contingencies that a party would apply for a permit to drill the type of well at issue and Louisiana would issue the permit. *Id.* at 321. The Court emphasized the open question of whether Louisiana would issue such a permit as a primary reason why the petitioners lacked standing. That is, "whether to issue a permit is a decision of independent actors." *Id.* The petitioners had no knowledge of Louisiana's approval process and thus could "only speculate about how Louisiana will operate its program and grant [the] permits." *Id.* at 322.

Thus, the Court, following *Clapper*, held that such a standing theory would "'require guesswork as to how independent decisionmakers will exercise their judgment.'" *Id.* (quoting *Clapper*, 568 U.S. at 413).

Nor does it matter that other contingencies existed in both *Clapper* and *Deep South.* A plaintiff must show that "all" of the events in the chain of possibilities are "certainly impending." *Deep South*, 138 F.4th at 321. If an allegation of harm "involves a chain of contingencies," then the court must "identify each contingency" prompting the injury, and "each link in the chain of contingencies must be 'certainly impending,' to confer standing." *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018).

In *Glass*, a professor challenged a Texas statute permitting the concealed carry of handguns on campus and a related University policy prohibiting professors from banning handguns in their classrooms. *Id.* at 236. The professor brought a First Amendment claim and argued that she had to self-censor her classroom discussions on certain topics out of fear that a student who disagreed with her might brandish a gun. *Id.* at 240. The Court explained that her allegations of harm contained "two contingencies: (1) harm from concealed-carrying students incited by classroom debate and (2) harm from University disciplinary action." *Id.* at 240. The State conceded that the professor would be disciplined if she banned concealed guns in her classroom, *id.* at 239-40, but the Court held, following *Clapper*, that Glass lacked standing to bring her First Amendment claim because she had produced no evidence "that a license-holder will illegally brandish a firearm in a classroom," *id.* at 241. "Ultimately, whether concealed-carrying students pose certain harm to [the professor] turns on their independent decision-making. Because she fail[ed] to allege

certainty as to how these students will exercise their future judgment, the alleged harm is not certainly impending," within the meaning of *Clapper*. *Id.*

Standing's traceability prong also overlaps with the independent-decisionmaker rule. "Traceability sometimes overlaps with the imminence prong of the injury in fact requirement." *Deep South*, 138 F.4th at 326. Although injury and traceability are not the same, "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021). "To satisfy that burden, the plaintiff must show at the least that third parties will likely react in predictable ways." *Id.*

Here, Plaintiffs cannot show that their injuries, the inability to purchase commercial property in Texas, are imminent or fairly traceable to any actions of the Attorney General because their future purchases necessarily depend on the independent decisions of third parties. Plaintiffs treat purchasing commercial real estate like purchasing a toothbrush, as an act that requires no independent decisions or approvals of any third party. But in purchasing real property, a seller must agree to the buyer's terms, including the purchase price and often dozens of provisions in a purchase agreement. Purchasers may also need to find a lender who will agree to provide a loan in order to make the purchase.

Plaintiffs do not allege the existence of a willing seller for any intended purchase, or any specifics of the transaction. Huang alleges only that she "plan[s] to purchase additional investment properties in Texas," and planned to "visit with Texas real estate agents" in October 2025. ROA.59. Dai states only that she previously held a

visa to enter the United States and intends to obtain a new one "to continue looking for more investment properties in the United States including Texas." ROA.63. She also states that she "would like to further diversify [her] assets and . . . was planning on purchasing a second property in the Houston area." ROA.62-63. These are allegations that Plaintiffs intend to go shopping. They reveal that no specific purchase is contemplated, or that a seller exists who is willing to sell property to them. Thus, their standing theories depend on "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

There is no material distinction between this case and *Clapper*, *Deep South*, and *Glass* for standing purposes. Whether the FISA court in *Clapper* would issue a search warrant, whether Louisiana in *Deep South* would approve a well permit, and whether a student in *Glass* would brandish a gun in class were all necessary contingencies before the relevant injury occurred that depended on the independent decisions of third parties. The same is true with Huang and Dai's non-existent sellers. Neither has pleaded even the existence of a seller, much less that such an individual has agreed to sell them commercial property. Before any SB 17 enforcement could occur, a willing seller must at least exist. *See* Tex. Prop. Code § 5.255(c) (any Attorney General enforcement occurs after SB 17 has been violated).

**b. Dai's injury further depends on a discretionary act of the federal government.**

Dai's injury, and its traceability to the Attorney General, also depends on obtaining a new visa to enter the United States, another contingency requiring an independent decisionmaker. Dai stated that she previously had a visa to enter the United

States from 2015 through 2025 and plans to obtain a new visa "to continue looking for more investment properties in the United States including Texas." ROA.95-96. But obtaining a new visa necessarily hinges on the independent decision of the federal government. As the Supreme Court has held, "Congress may delegate to executive officials the *discretionary authority* to admit noncitizens immune from judicial inquiry or interference." *Dep't of State v. Munoz*, 602 U.S. 899, 907 (2024) (emphasis added). And the Immigration Nationality Act "does not authorize judicial review of a consular officer's denial of a visa." *Id.* at 908. Because the decision of whether to grant or deny a visa to enter the United States necessarily involves the federal government's independent decision-making, Dai's purported injury is doubly speculative and even less traceable to the Attorney General. The federal government might not permit her to enter the United States to shop for property in Texas.

**2. Plaintiffs' injuries depend on locating property they desire to purchase.**

Regardless of the necessary decisions of independent third parties in purchasing commercial real estate, Plaintiffs lack a "credible threat of prosecution" and therefore no Article III injury because Plaintiffs have not yet even located property they intend to purchase. *LULAC*, 52 F.4th at 257.

As explained above, when an "allegation of harm involves a chain of contingencies," the Court must "identify each contingency." *Glass*, 900 F.3d at 239. "Each link in the chain of contingencies must be 'certainly impending' to confer standing." *Id.* It is not enough that there is an "objectively reasonable likelihood" that all the contingencies necessary for the injury will occur because that was the standard that

*Clapper* rejected. *See Clapper*, 568 U.S. at 410; *Deep South*, 138 F.4th at 321; *Glass*, 900 F.3d at 241.

Purchasing commercial real estate depends on dozens of contingencies. But at a bare minimum, the buyer must find a property that matches her intended use. While some real estate transactions are more complicated than others, Huang and Dai have pleaded no facts demonstrating that they have even found a piece of commercial property that they would like to purchase, and there are dozens of reasons why any given property for sale might not match the buyer's criteria, including price, location, the existence of encumbrances or zoning ordinances that forbid the buyer's intended use, and structural or maintenance problems with the property. But the point is this: before any Attorney General enforcement or even the seller's terms enter the picture, a buyer must at the very least have located a property that she intends to purchase. And it is not enough that there is an "objectively reasonable likelihood" that Huang and Dai will find such a property. Rather, they must show that finding such property is "certainly impending." Because Plaintiffs have pleaded no facts beyond the intent to go shopping, any credible threat of prosecution depends on multiple necessary and speculative contingencies.

**3. Plaintiffs' counterarguments are incorrect.**

The Court need not reach the issue of whether a credible threat of enforcement exists stemming from a hypothetical future enforcement action from the Attorney General because there is no credible threat of enforcement due to the necessary antecedent decisions of third parties. Regardless, Plaintiffs misunderstand the law

regarding when a credible threat of enforcement exists because of a possible future enforcement action.

First, Plaintiffs misunderstand *Wang*'s holding about when a court may presume a credible threat of enforcement from a state official. They suggest that *Wang* decided for the first time that courts only presume a credible threat of enforcement in First Amendment cases, that such a holding may conflict with this Court's decision in *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273 (5th Cir. 2025), and that *Wang* was wrongly decided. Appellant Br.23-26. But *Wang* did nothing but follow this Court's precedent as to when courts may assume a credible threat of enforcement.

*Wang* held that "plaintiffs enjoy a presumption of enforcement only in the First Amendment context." *Wang*, 161 F.4th at 362. In doing so, it expressly quoted a decision from 2024: "Unlike in other constitutional contexts, in the speech context, we may *assume* a substantial threat of future enforcement absent compelling contrary evidence." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024). In 2022, this Court held the same thing: "Plaintiffs argue that we must presume a credible threat of prosecution because this is a pre-enforcement challenge. They are mistaken. The presumption Plaintiffs rely on applies to pre-enforcement challenges to recently enacted . . . statutes that facially restrict expressive activity by the class to which the plaintiff belongs." *LULAC*, 52 F.4th at 257.

Thus, *Wang* broke no new ground on when courts apply the presumption of enforcement. Accordingly, to the extent that *Pueblo Entero*, decided in 2025, conflicts with the rule against presuming enforcement outside of the First Amendment, the earlier-decided cases of *National Press Photographers* and *LULAC* would control.

But there is no conflict. As Plaintiffs assert, in *Pueblo Entero*, "the Harris County District Attorney conceded that the Texas law prohibited the conduct in question." Appellant Br.24. Indeed, in that case, the plaintiff established that the statute at issue prohibited the conduct in question, and "state witnesses also testified that [the statute] applies to services provided by" the plaintiff. *Pueblo Entero*, 151 F.4th at 289. The district attorney also did not disavow prosecution under the statute at issue, so the Court found a credible threat of prosecution on these facts. *Id.* at 290.

The necessary piece was that state witnesses had testified that the statute applied to the Plaintiffs' conduct, not that the DA did not disavow prosecution. That was the piece of *Pueblo Entero* on which *Wang* focused, *see* 161 F.4th at 362, and any other reading of *Pueblo Entero* would conflict with both prior decisions of this Court and the Supreme Court. For example, in *National Press*, the Court held that the plaintiffs lacked standing to bring a pre-enforcement due process claim because they had never been arrested or prosecuted for violating the statute at issue, and the defendant state officials had never enforced the statute at issue. 90 F.4th at 782. The Court's reasoning as to that due process claim did not mention or turn on whether a state official disavowed enforcement. Nor would that have been possible because the Supreme Court has squarely held that it is Plaintiffs' burden "to prove their standing by pointing to specific facts, not the Government's burden to disprove standing by revealing details" of its enforcement priorities. *Clapper*, 568 U.S. at 412 n.4 (citation omitted). Thus, *Pueblo Entero* could not have relied on a presumption of enforcement, or a failure to disavow enforcement. A necessary condition to establish a

credible threat was some action taken by the State, there that the State had testified that the statute applied to the Plaintiffs.

Thus, Plaintiffs misunderstand the law regarding a credible threat of enforcement, and *Wang* was correctly decided in any event. Regardless, the court need not reach those issues here because any threat of enforcement depends on the independent decisions of third parties.

### C. Plaintiffs have not established traceability.

The three-part pre-enforcement test discussed above covers only standing's injury prong, not traceability or redressability. *See Wang*, 161 F.4th at 359; *Nat'l Press*, 90 F.4th at 782. But although "traceability sometimes overlaps with the imminence prong of the injury in fact requirement," that "does not mean the doctrines are coterminous." *Deep South*, 138 F.4th at 326.

In *A&R Engineering*, the Court explained that to meet standing's traceability prong in a pre-enforcement action, a plaintiff must show the actual or threatened enforcement of a statute. In that case, a plaintiff sued the Attorney General and alleged that a Texas statute violated the First Amendment because it required certain state contractors to certify that they did not boycott the State of Israel. *A&R Eng'g & Testing, Inc. v. Scott*, 72 F.4th 685, 687 (5th Cir. 2023). The Court ruled that although the plaintiff had established an economic injury, it could not trace that injury to the Attorney General. *Id.* at 690. The Court explained that "traceability is particularly difficult to show where the proffered chain of causation turns on the government's speculative future decisions regarding whether and to what extent it will bring enforcement actions in hypothetical cases." *Id.* The Court then held that the

plaintiff had not established traceability because "the Attorney General hasn't taken any action to suggest he *might* enforce the provision even if he has such power. Plaintiffs must assert an injury that is the result of a statute's actual or threatened *enforcement*." *Id.* "And where the plaintiff fails to allege such actual or threatened enforcement, the Supreme Court has instructed us to reject the mere potential for enforcement as a 'highly attenuated,' 'speculative chain of possibilities,' that cannot trace an injury to the government." *Id.* (quoting *Clapper*, 568 U.S. at 410). And in that vein, *Clapper* held that it is the plaintiff's burden to establish standing by pointing to specific facts regarding future enforcement actions, "not the Government's burden to disprove standing by revealing details of its . . . priorities." 568 U.S. at 412 n.4. Thus, *A&R Engineering* requires plaintiffs to show some type of actual or threatened enforcement to meet standing's traceability prong.

In the district court, Plaintiffs resisted that conclusion and attempted to distinguish *A&R Engineering* in three ways. None is relevant.

*First*, Plaintiffs contend that *A&R Engineering* involved whether the Attorney General "could" enforce the statute at issue. ROA.225. That's true but irrelevant. *A&R Engineering* expressly held that Plaintiffs failed to establish traceability "for two independent reasons." 72 F.4th at 690. "First, A&R has not shown that the Attorney General *could*" enforce the statute. *Id.* "Second, the Attorney General hasn't taken any action to suggest he *might* enforce the provision even if he has such power." *Id.* That second "independent reason[]" is what is dispositive here. *Id.*

*Second*, Plaintiffs suggested that *A&R Engineering* involved a six-year-old statute, whereas SB 17 is a newer statute. ROA.225-26. But the age of the statute played no

role at all in the Court's traceability analysis. *A&R Engineering*, 72 F.4th at 690-91. In fact, the age of the statute is never expressly mentioned in the opinion. The background section merely notes the year the statute at issue was passed and later notes the year that the facts of the case occurred in narrative form. *Id.* at 688.

*Third*, Plaintiffs contend that *A&R Engineering* "limited its analysis to when Attorney General enforcement could only result, if at all, 'as a highly attenuated, speculative chain of possibilities.'" ROA.226. That is not what the opinion says. Rather, it states that "Plaintiffs must assert an injury that is the result of a statute's actual or threatened enforcement. And where the plaintiff fails to allege such actual or threatened enforcement, the Supreme Court has instructed us to reject the mere potential for enforcement as a 'highly attenuated,' 'speculative chain of possibilities' that cannot trace an injury to the government." *A&R Eng'g*, 72 F.4th at 690 (quoting *Clapper*, 568 U.S. at 410). In other words, *A&R* held that the mere potential for enforcement *is* a speculative chain of possibilities within the meaning of *Clapper*. Indeed, "traceability is particularly difficult to show where the proffered chain of causation turns on the government's speculative future decisions regarding whether and to what extent it will bring enforcement actions in hypothetical cases." *Id.*

*A&R Engineering* therefore requires a showing of some type of actual or threatened enforcement. Plaintiffs' complaint never mentions any actual or threatened enforcement of SB 17 by the Attorney General. ROA.6-34. Plaintiffs do reference a recent settlement agreement that the Attorney General reached with an unrelated party in a separate case called *Colony Ridge.* Appellee Br.25-26. And perhaps in reply, Plaintiffs will point out that the Attorney General has recently promulgated

proposed administrative rules regarding SB 17. *See* 51 Tex. Reg. 1937. But neither helps Plaintiffs for two reasons.

*First*, "standing is determined as of the time that suit is filed." *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301 n.3 (5th Cir. 2005). Plaintiffs filed their complaint in September 2025, ROA.6, but the settlement agreement they reference is dated February 2026, s*ee* Ex. A at 30, *Texas v. Colony Ridge*, No. 4:24-cv-00941, (S.D. Tex. Feb. 10, 2026), Dkt. No. 97-1. And the proposed rules were published in March 2026. 51 Tex. Reg. 1940.

*Second*, traceability is plaintiff-specific. The question is not whether the Attorney General has enforced or threatened or enforce SB 17 generally, but whether he has done so vis-à-vis the plaintiffs before the Court. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Nothing about the proposed rules or a settlement agreement with another party has anything to do with Huang and Dai. Further, as discussed below, neither a settlement agreement nor proposed rules meet the definition of "enforcement" under this Court's standing or sovereign immunity jurisprudence. *See infra* 32-33. Because Plaintiffs have failed to allege "actual or threatened enforcement," at the relevant time and as to them, the Court should "reject the mere potential for enforcement" as insufficient to "trace an injury to the government." *A&R Engineering*, 72 F.4th at 690.

## II. Sovereign Immunity Bars This Suit.

Sovereign immunity bars this suit because Plaintiffs have pointed to no act of compulsion or constraint taken by the Attorney General vis-à-vis SB 17. "Generally, state sovereign immunity precludes suits against state officials in their official

capacities." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024). *Ex parte Young*, 209 U.S. 123 (1908), created an exception to state sovereign immunity. To invoke that exception, "a state official must have some connection with the enforcement of the law being challenged." *Ogg*, 105 F.4th at 325. That means a plaintiff must show three things: "(1) the state official has more than the general duty to see that the laws of the state are implemented, i.e. a particular duty to enforce the statute in question; (2) the state official has a demonstrated willingness to exercise that duty; and (3) the state official, through her conduct, compels or constrains persons to obey the challenged law." *Id.* (cleaned up).

The second and third prongs are relevant here. Under the second prong, "the state officials must have taken some step to enforce the statute." *Id.* at 329. "In deciding how big the step must be, the bare minimum appears to be some scintilla of affirmative action by the state official." *Id.* "If the plaintiffs bring a pre-enforcement action, as has occurred here, prior enforcement obviously will be lacking. Nevertheless, we still require some scintilla of affirmative action by the state official." *Id.* A history of prior enforcement is not required, but even if the statute is new, "the Plaintiffs must allege *some* action taken . . . to show a demonstrated willingness to enforce." *Id.* at 330. Further, "a failure to disavow future prosecutions" "is not fatal" to a state official's sovereign immunity. *Id.* at 331.

As to the third prong, "panels in this circuit have defined 'enforcement' as 'typically involving compulsion or constraint.'" *Id.* at 332. "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* Importantly, "the existence of the

challenged statutes" combined with a state official's "authority" to prosecute under them "is insufficient to demonstrate compulsion or constraint." *Id.*

In the district court, Plaintiffs did not point to a single affirmative act of compulsion or constraint taken by the Attorney General regarding SB 17. ROA.228-29. But now they make, or might make, three arguments in an attempt to demonstrate the necessary compulsion or constraint. None are correct.

*First*, on appeal, Plaintiffs point to a recent settlement agreement, discussed above in the standing context, in a case called *Colony Ridge*. Appellant Br.25-26. But that agreement does not show compulsion or constraint. The Attorney General did not bring a cause of action under SB 17 in that case, but rather sued under the Deceptive Trade Practices Act and asserted claims under the Texas Business and Commerce Code, Consumer Financial Protection Act, and Interstate Land Sales Full Disclosure Act. *See* First Amended Complaint, *Texas v. Colony Ridge Inc.,* No. 4:24-cv-00941 (S.D. Tex. May 24, 2024), ECF 27 at 50-64. There was no SB 17 claim in that case, and to date, the Attorney General has never sued anyone for violating SB 17.

Thus, plaintiffs do not point to an SB 17 case, but rather point to one of many terms in the settlement agreement between the State and Colony Ridge, in which Colony Ridge agreed to comply with SB 17. Joint Motion for Dismissal, Ex. A, *Texas v. Colony Ridge Inc.,* No. 4:24-cv-00941, (S.D. Tex. Feb 10, 2026), ECF 97-1 at ¶ 9-11. But entering into a settlement agreement is not an act of compulsion or constraint. It is a voluntary agreement between parties. By definition, a settlement agreement must be "knowing" and "voluntary" *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994); *Smith v. Amedisys Inc.*, 298 F.3d 434, 441 (5th Cir. 2002). Indeed,

"a settlement agreement . . . is a contract, and its construction is governed by legal principles applicable to contracts generally." *Rodriguez v. Villarreal*, 314 S.W.3d 636, 641 (Tex. App.—Houston [14th Dist.] 2010, no pet.). That means "each party consented" to the terms of the contract. *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). Because parties must voluntarily enter into settlement agreements, the act of signing them cannot be through compulsion.

*Second*, Plaintiffs might point to the Attorney General's recently-promulgated proposed administrative rules regarding SB 17 in an attempt to suggest that they are acts of compulsion or constraint. *See* 51 Tex. Reg. 1937-1940. But a proposed rule is just that, a proposal. For a rule to become effective, all of the Texas Administrative Procedure Act's requirements must be satisfied. For example, "before adopting a rule," a state agency must provide a public comment period and must "consider fully all written and oral submissions about a proposed rule." Tex. Gov't Code § 2001.029(a), (c). And the state agency must enter an order finally adopting the rule before it can become effective. *Id.* § 2001.033(a). Other rulemaking requirements apply too. But because the Attorney General has not adopted his proposed rules, they cannot compel or constrain anyone.

*Third*, Plaintiffs have pointed to this Court's decision in *Healthy Vision Association v. Abbott*, 138 F.4th 385 (5th Cir. 2025), for the propositions that "the threat of onerous penalties is the ongoing compulsion or constraint," that is needed to overcome sovereign immunity, and that a duty to create enforcement procedures is enough too. ROA.229. The arguments misread both this Court's cases and the text of SB 17.

Discussing *Ex parte Young*, *Healthy Vision* held that because a statute gave the state official at issue a *mandatory duty* to enforce the statute at issue, she lacked sovereign immunity. The Court held that "discretionary authority to act, *on its own*, is insufficient to give rise to a sufficient connection to enforcement." 138 F.4th at 397 (cleaned up). But "this does not foreclose a plaintiff from using the extension of authority to an official to enforce a statute to connect an official's discretion to actual enforcement by indicating some reasonable prospect of how that discretion is to be exercised." *Id.* (cleaned up). And in that case, the statute at issue said that "the commissioner *shall* take all reasonable actions to ensure compliance with this subchapter, including issuing orders to enforce this subchapter." *Id.* at 396-97 (quoting Tex. Ins. Code § 1451.158(b)) (emphasis added). The Court held that "the emphasis should be on '*shall*,' which indicates that however much discretion the Commissioner may have as to the details, enforcement of the statute is mandatory." *Id.* at 397. It was in this context that the Court held that "the threat of onerous penalties is an ongoing 'compulsion or constraint,'" *Id.*; *see* ROA.229. Because enforcement of the statute was mandatory, the plaintiffs in that case met their burden to overcome sovereign immunity. *Healthy Vision*, 138 F.4th at 399. Indeed, *Healthy Vision* must be read in that way in order to be harmonized with *Ogg*, which squarely held that the existence of a statute and a state official's authority to enforce it is insufficient to overcome sovereign immunity. *Ogg*, 105 F.4th at 332-33.

That analysis does not apply here. SB 17 gives the Attorney General the mandatory duty to create procedures for investigations using the word "shall," but gives him discretionary authority to bring actions to enforce the statute using the word

"may." And this Court has squarely held that an investigation is not compulsion or constraint within the meaning of *Ex parte Young*: "to the extent the Plaintiffs argue [the District Attorney's] ability to *investigate* election code violations compels or constrains their conduct, that power does not rise to the level of compulsion or constraint needed." *Ogg*, 105 F.4th at 332.

More specifically, SB 17 states that "the Attorney General *shall* establish procedures to examine a purchase or acquisition of an interest in real property and determine whether an investigation of a possible violation of this subchapter is warranted." Tex. Prop. Code § 5.255(a) (emphasis added). Then, "*if* the attorney general determines that an investigation . . . is warranted . . . the attorney general *shall* investigate the purchase or acquisition of an interest in real property and determine whether a violation of this subchapter occurred." *Id.* § 5.255(b) (emphasis added). "If the attorney general determines that a violation of this subchapter occurred, the attorney general: (1) *may* bring an in rem action against real property to enforce this subchapter…." *Id.* § 5.255(c)(1) (emphasis added). And "the attorney general *may* bring an action in the name of the state against a company or entity that violates this subchapter." *Id.* § 5.259(a) (emphasis added).

Thus, *Healthy Vision* does not apply because the Attorney General has discretionary authority to bring enforcement actions under SB 17, and his mandatory duty concerns investigations which are not compulsion or constraint. Plaintiffs' argument that the Attorney General has a "specific and relevant duty to create the procedures for enforcement" of SB 17 is wrong both legally and factually. *Contra* ROA.229.

Because the text of SB 17 is not sufficient to overcome sovereign immunity, "we focus our attention on [the official's] actions." *Ogg*, 105 F.4th at 332. Because "the Plaintiffs have failed to demonstrate" that the Attorney General "has acted or will likely act in a way that would compel or constrain the Plaintiffs," they cannot overcome sovereign immunity. *Id.* at 332-33. That alone disposes of this appeal.[3]

## III. Plaintiffs Have No Cause of Action.

Plaintiffs have no cause of action because *Ex parte Young*'s equitable cause of action does not apply to foreign citizens outside the United States. Although the parties did not directly raise this issue below, the district court did. It held that "foreign citizens outside the United States or a U.S. territory have not been allowed to assert rights under the U.S. Constitution. Congress may seek to enact laws that afford foreign citizens abroad statutory rights or causes of action against misconduct by U.S. Government officials, or laws that otherwise regulate the conduct of U.S. officials abroad, but that would require a foreign plaintiff to state such a statutory claim." ROA.447 (internal citation omitted). This Court may review an issue "not pressed below so long as it has been passed upon." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 330 (2010) (cleaned up).

Relatedly, Plaintiffs have argued before this Court that "it's not clear why Appellants cannot bring a pre-enforcement challenge merely because they are currently outside the United States." Appellant Br.15. According to Plaintiffs, "it would make

---

[3] In discussing sovereign immunity, Plaintiffs also mentioned below that the Attorney General has not disclaimed enforcing SB 17. ROA.228. But such a statement is not necessary to retain sovereign immunity. *Ogg*, 105 F.4th at 331.

little sense to allow Plaintiffs to exercise First Amendment rights as a defense in litigation but deny them the ability to raise a pre-enforcement challenge to imminent civil liability on the same grounds." Appellant Br.15. The Attorney General is certainly permitted to respond to that argument.

As the district court suggested, the answer is that Plaintiffs have no private right of action because no statute authorizes them to bring this case, and *Ex parte Young*'s equitable cause of action does not apply to foreign citizens outside the United States,

Start with the basics. Plaintiffs sued the Attorney General only in his official capacity, ROA.6, and only for constitutional violations, ROA.23-31. So although the Plaintiffs invoked 42 U.S.C. § 1983, ROA.8, 26, it was improper to do so. "Suits against state officials in their official capacity . . . should be treated as suits against the State." *Freedom From Religion Foundation, Inc. v. Mack*, 4 F.4th 306, 311 (5th Cir. 2021). And "suits against the State under 42 U.S.C. § 1983 are doubly dismissible because the State is not a 'person' under that statute." *Id.* (citing *Will v. Mich. Dep't of State Polic*e, 491 U.S. 58 (1989)). Thus, "the only way to bring an official-capacity claim against an officer of the State is to do so under the equitable cause of action recognized in *Ex parte Young.*" *Id.* To be sure, Plaintiffs' complaint cited *Ex parte Young*, ROA.9, but the district court was right to suggest that Congress, not the courts, must give foreign citizens outside the United States a cause of action in order for them to proceed. ROA.447.

This Court is familiar with *Hernandez v. Mesa*, 589 U.S. 93 (2020). That case, involving a cross-border shooting, generated two en banc opinions and two Supreme Court opinions. *See Hernandez v. United States*, 785 F.3d 117 (5th Cir. 2015) (en

banc), *vacated and remanded*, *Hernandez v. Mesa*, 582 U.S. 548, 555 (2017); *Hernandez v. Mesa*, 885 F.3d 811 (5th Cir. 2018) (en banc), *aff'd*, 589 U.S. 93, 114 (2020). At the end of that lengthy saga, the Supreme Court ultimately held that that the judicially-created *Bivens* cause of action did not apply extraterritorially. *Hernandez*, 589 U.S. at 113-14. In doing so, the Court explained that it "frequently look[ed] to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action." *Id.* at 109. It explained that *Bivens* is a "more limited federal analog" of § 1983. *Id.* "It is therefore instructive that Congress chose to make § 1983 available only to 'citizen[s] of the United States or other person[s] within the jurisdiction thereof.'" *Id.* (quoting 42 U.S.C. § 1983). Thus, "it would be anomalous to impute . . . a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action." *Id.* (cleaned up). "Thus, the limited scope of § 1983 weighe[d] against recognition" of an extraterritorial *Bivens* claim. *Id.*

Further, § 1983's "express limitation to the claims brought by citizens and persons subject to United States jurisdiction is especially significant, but even if this explicit limitation were lacking, we would presume that § 1983 did not apply abroad." *Id.* That is because courts "presume that statutes do not apply extraterritorially to ensure that the judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Id.* at 110. "If this danger provides a reason for caution when Congress has enacted a statute but has not provided expressly whether it applies abroad, we have even greater reason for hesitation in deciding whether to extend a judge-made

cause of action beyond our borders." *Id.* "Where Congress has not spoken at all, the likelihood of impinging on its foreign affairs authority is especially acute." *Id.*

For many of the same reasons that the Supreme Court refused to extend *Bivens* extraterritorially, this Court should not extend *Ex parte Young*'s equitable cause of action. *Ex parte Young* and § 1983 are close analogues because both permit plaintiffs to sue state officials for constitutional deprivations, though the former permits suits against state officials in their official capacity for injunctive relief, *Mack*, 4 F.4th at 311-12, and the latter permits suits against officials in their individual capacity for damages, *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). But just as *Bivens* and § 1983 are analogous, so are § 1983 and *Ex parte Young*. Because Congress chose to make § 1983 applicable only to citizens of the United States or those within the United States, the Court should not impute "a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action." *Hernandez*, 589 U.S. at 109 (cleaned up).

Further, because Courts begin with the presumption that statutes do not apply abroad absent a clear statement from Congress, Courts should apply an even stronger presumption that judicially-created causes of action do not because the Court risks impinging on Congress's power over foreign affairs. *Id.* at 109-10. "Congress, which has authority in the field of foreign affairs, has chosen not to create liability in similar statutes," like § 1983, so the Court should not do so with *Ex parte Young*. *Id.* at 113. Ultimately, when evaluating whether to extend a judicially-created cause of action, the "most important question" is "who should decide," "Congress or the courts?" *Id.* at 114. Because Congress chose not to give Plaintiffs like Huang

and Dai the ability to assert § 1983 claims, the Court should not circumvent Congress's choice and permit them to assert similar claims under *Ex parte Young*. In sum, it cannot be that non-citizens outside the United States may invoke the equitable cause of action in *Ex parte Young* when they cannot invoke § 1983.

## IV. Plaintiffs Do Not Have the Constitutional Rights They Assert.

### A. Plaintiffs have no substantial connection to the United States.

Generally, "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 591 U.S. 430, 433 (2020). To be sure, "foreign citizens in the United States may enjoy certain constitutional rights—to take just one example, the right to due process in a criminal trial." *Id.* at 434. "But the Court has not allowed foreign citizens outside the United States or such U.S. territory to assert rights under the U.S. Constitution." *Id.* "If the rule were otherwise, actions by American military, intelligence, and law enforcement personnel against foreign organizations or foreign citizens in foreign countries would be constrained by the foreign citizens' purported rights under the U.S. Constitution. That has never been the law." *Id.*

Aliens within the United States of course do have various constitutional rights. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 270-71 (1990) (collecting cases). But the Supreme Court held that its cases on that point "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271.

Thus, the provisions of the Fourteenth Amendment, at issue here, ROA.26, apply "*to all persons within the territorial jurisdiction*" of the United States. *Verdugo*, 494 U.S. at 271 (quoting *Plyler v. Doe*, 457 U.S. 202, 212 (1982)). But an alien "who has had no previous significant voluntary connection with the United States" and is outside the United States has no constitutional rights. *Id.* at 271.

This Court has decided few cases discussing this "significant voluntary connection" or "substantial connection" test. But in one, it explained that in *Verdugo*, "the Court held that the defendant did not have a significant voluntary connection to the United States even though the DEA believed he was a leader of a drug trafficking organization that was smuggling narcotics into the United States." *United States v. Rojas*, 812 F.3d 382, 398-99 (5th Cir. 2016). The Court also applied the substantial connection test during its first en banc decision in *Hernandez*, *see Hernandez v. United States*, 785 F.3d at 119, before the Supreme Court vacated that decision for separate reasons, *see Hernandez*, 582 U.S. at 554-55.

Relevant here, the Ninth Circuit applied the substantial connection test to hold that a non-citizen Stanford University Ph.D. student who left the United States and could not re-enter had the substantial connection needed to assert constitutional claims. In that case, the plaintiff, Ibrahim, was a citizen of Malaysia pursuing a Ph.D at Stanford on a student visa. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 987-88 (9th Cir. 2012). She traveled to a Stanford-sponsored conference back in Malaysia to present her doctoral research. *Id.* at 987. But she was prevented from returning to the United States after the conference because the federal government placed her on certain watch lists, which she alleged was a mistake. *Id.* Ibrahim brought First and

Fifth Amendment claims, but the federal government argued that she had no such rights because she was a foreign citizen who voluntarily left the United States. *Id.* at 991.

The Ninth Circuit disagreed. It began with the "uncontested proposition" that if Ibrahim had remained in the United States, she could have brought her claims, such that the issue was whether she lost her rights by leaving the United States. *Id.* at 994-95. The Court explained that under *Verdugo*, "the inquiry is whether the alien has voluntarily established a connection with the United States, not whether the alien has voluntarily left the United States." *Id.* at 996. The Court applied that test and held that Ibrahim had a "significant voluntary connection" with the United States because she pursued a Ph.D at Stanford for four years, and voluntarily departed only to present the results of her research at a Stanford-sponsored conference such that the purpose of her trip was really to "further, not to sever, her connection to the United States, and she intended her stay abroad to be brief." *Id.* at 997. But the Ninth Circuit expressly cautioned "we do not hold that tourists, *business visitors*, and all student visa holders have the same connection to the United States as Ibrahim." *Id.* at 997 (emphasis added).

Under this approach to the substantial connection test, Huang and Dai cannot assert constitutional claims. They intend to be "business visitors" or "tourists" in the United States. Nor did they live in the United States and briefly depart with the intent of returning as Ibrahim did. Rather, Huang and Dai do not allege that they have ever lived in the United States. Huang alleges that she has lived in Shanghai for many years, does not live in the United States, and "occasionally visit[s] the United

States and stay[s] briefly in the United States on a B-1/B-2 visitor visa for [her] work." ROA.59. Dai states that she lives in New Zealand, does not live in the United States, previously held a business or tourist visa to enter the United States but presently does not, and plans to get a new business or tourist visa only to look for property in the United States to purchase. ROA.62-63. To permit Huang and Dai to assert constitutional claims, the Court would have to hold that foreign citizens who have never lived in the United States, are not presently in the United States, and only occasionally come here as tourists or business visitors have a substantial connection to the United States.

### B. Plaintiffs' arguments are incorrect.

Plaintiffs never discuss the substantial connection test. Instead, they advance a series of arguments ignoring that test. None are correct.

*First*, they contend that they will be in the United States at the time they make the purchase that SB 17 forbids. Appellant Br.13-14. But they have invoked the jurisdiction of a federal court now and ask a federal court to *adjudicate* their rights now, as foreign citizens outside the United States with no substantial connection to the United States. The question is what rights do Huang and Dai have at the time the Court adjudicates them. If Plaintiffs successfully enter the United States, and it is not clear that Dai will be able to do so because she presently has no visa, ROA.62, then their rights might change. But as long as they are outside the United States, the Court must apply the substantial connection test.

*Second*, Plaintiffs assert that foreign citizens outside the United States "may bring pre-enforcement challenges," Appellant Br.14, assert that their location is not

relevant to the three-part pre-enforcement test discussed above, Appellant Br.15 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)), and even contend that it makes no sense to deny them the ability to assert rights offensively, when they could do so as a defense to litigation, Appellant Br.15. As explained above, that argument is based on a misunderstanding of the federal courts and the federal system. Whether one has a private right of action is an entirely different question from whether one has a constitutional right or may assert one defensively. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Absent a statute creating a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter . . . ." *Id.* at 286-87. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Id.* at 287. To be sure, federal courts used to create equitable causes of action, like *Ex Parte Young*, *see Mack*, 4 F.4th at 311 n.3, but as explained above, the text of § 1983 does not give Plaintiffs a private right of action, and this Court should not extend *Ex parte Young* to do so when Congress has not.

*Third*, Plaintiffs point to this Court's decisions in *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226 (5th Cir. 2022) (en banc), and *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *aff'd* 606 U.S. 461, 499 (2025). Appellant Br.16-17. But those cases do not help them because they did not apply the substantial connection test.

*Free Speech Coalition* involved a First Amendment challenge brought by various "commercial pornographic websites," including both domestic and foreign corporations that "produce, sell, and host pornography." *Free Speech*, 95 F.4th at 266. Relevant here, the Court explained that the foreign corporations did have First Amendment rights "when they speak in the United States." *Id.* at 287.

*Douglass* involved a Japanese shipping company whose ship crashed into an American destroyer in Japanese territorial waters. 46 F.4th at 230. The representatives of the American sailors killed sued the company in federal court. *Id.* at 231. The Court held that the corporation could assert Fifth Amendment due process rights because a deprivation of the right to due process can only occur at trial in an American court in the United States. *Id.* at 232.

But the substantial connection test was not at issue in either case. That was likely because the corporation at issue in *Douglass* ran a major shipping business that made approximately 1500 annual port calls in the United States, handled shipments "bound for the United States," and had "cargo operations in the United States." *Id.* at 230. Relatedly, foreign corporations that maintain adult-content websites that are constantly available for American audiences might have a substantial connection as well. *Free Speech*, 95 F.4th at 266, 287. But regardless, "where an opinion fails to address a question squarely, we will not treat it as binding precedent." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 229 n.15 (5th Cir. 2020). And if a previous opinion made an assumption, then "that assumption is not binding," if the court "did not consider that issue." *Id.* A decision is binding only if "a panel gives that issue *reasoned consideration*." *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021).

Because the substantial connection test was not at issue in either *Douglass* or *Free Speech*, those decisions are inapposite here.

*Fourth*, Plaintiffs cite three cases about the government *taking away* property owned by foreigners but located in the United States. The first case helps the Attorney General. It expressly applied the substantial connection test before announcing that the Due Process Clause applied to government action taking away preexisting property held in the United States. It held that "we have reviewed the entire record including the classified information and determine that [petitioner] can rightly lay claim to having come within the territory of the United States and developed substantial connections with this country." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C. Cir. 2001). Because the petitioners had "entered the territory of the United States and established substantial connections with this country" they were "entitled to the protections of the Constitution." *Id.* at 203. After making that holding, the Court explained that the petitioners had a bank account in the United States, and held that "a foreign organization that acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention." *Id.* at 204. But that holding, on which Plaintiffs rely, Appellant Br.16, came only after applying the substantial connection test. And in any event, the case concerned preexisting property in the United States, not an attempt to purchase new property.

Plaintiffs' second case held that "where a district court exercises its jurisdiction over property within the United States, however, the owners of that property have due process rights regardless of their location or nationality." *Stansell v.*

*Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 725 (11th Cir. 2014); Appellant Br.19. But again, that was said in the context of seizing preexisting property, not purchasing new property. *Id.* at 722. Plaintiffs' third case also involved whether the Government could deprive a foreign citizen outside the United States of his preexisting property in the United States without due process. *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 108-09, 110-11 (2d. Cir 1966); *see* Appellant Br.19. In that context, the Court held that it was "so patently erroneous in a case involving property in the United States" to suggest that the foreign plaintiff had no constitutional rights. *Id.* at 111.

But here, Huang and Dai do not suggest that the Attorney General intends to take away their pre-existing property without due process. Rather, they suggest that they have a constitutional right to purchase additional property, but the cases they cite do not address that proposition.

### C. The Supremacy Clause does not permit Plaintiffs to assert their claims.

Plaintiffs finally suggest that they can assert preemption claims because suing under the Supremacy Clause does not vindicate their own rights but is "instead indirectly enforcing the rights of the federal government." Appellant Br.20.

That is wrong. The Supremacy Clause "creates a rule of decision." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). Courts "must not give effect to state laws that conflict with federal laws." *Id.* But the Supremacy Clause "is not the source of any federal rights," and "certainly does not create a cause of action." *Id.* at 324-25. "It instructs courts what to do when state and federal law clash but is

silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. In short, the Supremacy Clause is a rule of decision for courts to follow, but it is not a vehicle for asserting the federal government's rights.

This goes back to Plaintiffs' cause of action problem. The Supremacy Clause does not give Plaintiffs a private right of action to assert the federal government's rights, and they cannot use *Ex parte Young* or § 1983 to bring claims in this case in any event. Plaintiffs point to no statute permitting them to assert the federal government's rights, even though Congress has created such statutes in other contexts. For example, the False Claims Act permits private parties to bring suits "in the name of the Government," and "the injury they assert is exclusively to the Government" *United States, ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 424-25 (2023). And the FCA "effects a partial assignment of the Government's own damages claim." *Id.* at 425. The Supremacy Clause does none of those things.

Further, if the Supremacy Clause were really about asserting the federal government's rights, then Plaintiffs would have to explain how they have third-party standing to do so. "A party must ordinarily assert only his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third-parties." *Vote.Org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022). A narrow exception exists where "the party asserting the right has a close relationship with the person who possesses the right and there is a hindrance to the possessor's ability to protect his own interests." *Id.* at 304. So, if the Supremacy Clause were about vindicating the federal government's rights, Plaintiffs would have to show that as foreign citizens outside the United States, they have a close relationship with the federal

government, and the federal government is hindered from suing Texas officials. They cannot do so.

So, the Supremacy Clause is a rule of decision for courts to follow. It is not a vehicle permitting others to assert the federal government's rights, and certainly not without a statute.

The cases that Plaintiffs cite do not hold that the Supremacy Clause permits them to enforce the federal government's rights, and all were decided before *Armstrong* in any event. Appellant Br.20-22. Plaintiffs point to a district court opinion holding that "a plaintiff is not required to assert a federally created 'right'" but still must have standing. *Immigr. Reform Coal. of Tex. v. Texas*, 706 F. Supp. 2d 760, 764 (S.D. Tex 2010). But that is a separate point from whether one may assert the federal government's rights.

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 331-35 (5th Cir. 2005), held that an implied right of action existed to assert preemption claims, a point that *Armstrong* expressly overruled, 575 U.S. at 324-25. Plaintiffs also point to a passage in *Shaw v. Delta Air Lines, Inc.*, holding that a plaintiff who brings a preemption claim "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." 463 U.S. 85, 96 n.14 (1983). But whether federal question jurisdiction exists is distinct from whether plaintiffs have a private right of action or can assert the federal government's rights. And the issue of standing is distinct as well. *Contra* Appellant Br.22.

So, Plaintiffs have not shown how the Supremacy Clause permits them to assert the federal government's rights, what statute assigns them the federal government's

claims, or how they have a private right of action in the first instance. That leaves Plaintiffs with *Ex parte Young*. As explained above, they can't use it.

Finally, it is worth stepping back. It would be a strange result indeed if foreign citizens outside the United States and with no substantial connection to the United States could *not* assert rights like those found in the First or Fourteenth Amendment but *could* assert the federal government's rights. Plaintiffs ask the Court to hold that the Supremacy Clause permits a person with no ties to the United States to enforce the rights of the federal government, absent any statute assigning them the federal government's claims. The Court should not do so.

## Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ Benjamin Wallace Mendelson
Benjamin Wallace Mendelson
Deputy Solicitor General
Ben.Mendelson@oag.texas.gov

*Counsel for Appellee*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,990 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ Benjamin W. Mendelson
Benjamin W. Mendelson